# THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION

| | |
|---|---|
| ANGELITA BRIDDELL,<br><br>Plaintiff,<br><br>vs.<br><br>THE CITY OF SHELBY and JOHN WHITE,<br><br>Defendants. | Case No.<br><br>Hon. |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**Introduction**

1.      This is a housing harassment case. Angelita Briddell, along with her children, began renting an affordable home from the City of Shelby Department of Housing in August 2018. At the time, the City of Shelby ("City") employed John White as the Department's Resident Services Specialist. From the start, White routinely made crude comments to Briddell about wanting to have sex with her. Briddell told him no, but he was persistent and continued to harass her for the next several years. Briddell could not afford other housing and felt powerless to do anything about White's behavior. Briddell repeatedly reported White's harassment, but the City did nothing for years. Finally, Briddell caught White on video admitting that "I came onto you and I tried to fuck you. I tried to fuck you about—at least 10 times I asked for it. I know that." The City fired White after learning about the video. Briddell now sues to recover for her injuries.

1

## Jurisdiction & Venue

2. This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1331 because of Briddell's federal Fair Housing Act claim.

3. This Court has subject-matter jurisdiction over Briddell's remaining claims under 28 U.S.C. § 1367 because they arise from the same facts as her federal claim.

4. Venue is proper in this judicial district because the relevant events occurred in Cleveland County and the individual parties reside in Cleveland County.

## Parties

5. Plaintiff Angelita Briddell is a person living in Shelby, North Carolina.

6. Defendant the City of Shelby is a city in Cleaveland County, North Carolina.

7. Defendant John White is a person living in North Carolina.

## Allegations

8. The City of Shelby's Housing Department ("Department") provides housing for low-income families. The Department is an entity of local government operated and controlled by the City. Upon information and belief, Defendant City of Shelby waived its governmental immunity pursuant to N.C. Gen. Stat. § 160A-485, for the state-law claims alleged herein by purchasing insurance issued by an insurer or an authorized local government risk pool.

9. John White was employed by the City of Shelby as the Department's Resident Services Specialist. Defendant City of Shelby is sued, in part, under North Carolina law, pursuant to the doctrine of respondeat superior, for the wrongful acts and omissions of Defendant White.

### *Angelita Briddell*

10. Briddell is a 37-year-old woman who used to live at 405 Piedmont Avenue, a five-bedroom apartment provided by the City of Shelby's Department of Housing.

11. Before moving to Shelby, Briddell lived with her three children (she had her other two children after moving to Shelby) and then-husband in Charlotte, North Carolina. But, in late 2016, the family fell on hard times and was evicted from their home.

12. Briddell and her then-husband could not find a new affordable home in Charlotte, and for six weeks, the family was left homeless and living in a shelter.

13. Briddell and her family eventually moved to Shelby, North Carolina.

14. In late August 2018, they secured affordable housing—the apartment at Piedmont Avenue—through the City of Shelby's Housing Department.

15. In September 2018, the family moved into their new home.

*White Begins Harassing Briddell*

16. Shortly after Briddell moved into her new home, White began to harass her.

17. It started when, one weekend, Briddell invited her sister to come stay with her.

18. Briddell ran into White in her front yard, and White asked Briddell who was staying with her.

19. Briddell said the woman was her sister.

20. White then said: "I'm gonna get with her; she look good."

21. Briddell warned White that this was a bad idea and reminded him that he was married.

22. But White responded: "Yeah but [my wife] don't give me none."

23. Briddell repeated that it wasn't a good idea for White to pursue her sister.

24. About a week later, White came to Briddell's apartment so he could replace an air filter.

25. This time, he targeted Briddell.

26. He told her: "You seem like a nice person; you seem like a nice girl."

27. Briddell responded that she was nice, and that she wouldn't cheat on her husband.

28. But White was persistent. He told Briddell: "Oh, just try it, you don't know if you'll like it."

29. Briddell repeated that she wouldn't cheat on her husband.

30. But White said he was pretty sure he could change her mind.

31. Briddell still refused his advances, and soon, White left.

*White's Harassment Becomes Routine*

32. In early 2019, Briddell and her husband separated, and he moved out of the apartment. After that, White increased the frequency and intensity with which he sexually harassed Briddell.

33. Whenever Briddell was alone and ran into White, he would say things like: "I'mma lick that thing. Let me eat that thing. I don't even want to have sex you know. I just want to eat it. I know if I eat it you'll have sex with me."

34. White would continue to ask out Briddell, saying things like: "Let me just take you on a date. I want to take you to a hotel room."

35. White would also brag, saying: "I'll be the best you had. I know you might not like older men, but I'll give you a reason why you want to deal with an older man."

36. Briddell's response was the same every time: She told White no.

37. But White was undeterred. Over the next three and a half years, he harassed Briddell dozens, perhaps hundreds, of times.

38. Much of this harassment took place while White was inside Briddell's apartment, claiming to perform maintenance.

39. Some of the harassment took place elsewhere. In December 2019, for example, the two ran into each other at a middle school basketball game. Briddell's daughter was performing as a cheerleader, and White was attending the game with his wife. At one point, White left his wife's side and approached Briddell. He told her: "Oh, you sure look good, Angelita. I'd sure like to eat that thing."

*White Enters Briddell's Apartment*

40. On top of these persistent sexual requests, White also inserted himself into Briddell's life.

41. White regularly entered Briddell's unit under the pretext of performing maintenance.

42. Often, however, there was no reason for White to enter Briddell's home.

43. He would claim, for instance, that he needed to replace an air filter, even though he had replaced the filter only a couple weeks before, and even though the standard schedule was to replace the filter once per month.

44. Briddell would not receive a call from White announcing that he was going to enter her unit, either.

45. Instead, White would show up, knock, and then quickly let himself in—with neither notice nor permission.

46. White would also linger outside Briddell's apartment where she could see him.

47. And he warned her not to speak with people in the neighborhood or to go to Bryan Howell, the Director of Housing, but instead to only speak with him.

*Briddell Complains to the City of Shelby's Housing Department*

48. Briddell could not afford to leave her apartment at Piedmont Avenue despite White's harassment.

49. After separating from her husband, Briddell was financially constrained and could not afford any other housing.

50. Nor did Briddell believe she had the power to stop White's harassment.

51. Her circumstances forced her to endure White's harassment.

52. Briddell's neighbors told her that everyone knew the truth about White—that he was a sexual harasser and never got in trouble—and he would never get fired for his behavior.

53. Bridell also worried she could face retaliation if she reported White's behavior.

54. But not long after her husband moved out in early 2019, Briddell decided to try and stop White's harassment.

55. She began by calling Bryan Howell, the Director of Housing, on the phone and reporting White's behavior.

56. She told Howell in detail that White had been sexually harassing her.

57. Howell did nothing.

58. So White remained employed by the City of Shelby, and he continued to harass Briddell for years.

59. Over the next four years, Briddell spoke with Howell at least several more times.

60. In each of those conversations, Briddell reported that White was sexually harassing her.

61. But Howell would tell Briddell that she was just complaining.

62. Their final conversation was around May 2023.

63. Again, Briddell told Howell that White had been sexually harassing her.

64. Still, White remained employed by the City of Shelby.

65. White's sexual harassment, combined with the City's inaction, left Briddell living in constant fear.

66. White had a key to her apartment, showed up regularly and unannounced, and made so many explicit sexual advances on her, that Briddell worried that White would enter her apartment and sexually assault her.

67. Briddell also worried for her children. She's a single mother, and at times, she had to go to work, leaving her eldest daughter to watch over her other children. Briddell was afraid that White might enter the unit and harass the children.

68. Briddell was not alone with these fears.

69. White made sexual advances on one of Briddell's neighbors, a woman named Lekisha Ussery.

70. Ussery is a very trim and small woman.

71. Once, White told her that he had never been with a smaller woman, and he wondered what it was like.

72. As was the case with Briddell, White would enter Ussery's apartment every couple of weeks under the pretext of changing her air filter.

73. Ussery also found White lingering outside of her apartment.

74. Ussery did not want White to enter her apartment.

75. Once, White knocked and was about to enter, but Ussery jumped up and used her foot to keep the door shut. White repeatedly tried to enter her unit, using his key, but Ussery kept her foot against the door and kept the door locked.

76. In 2022, Ussery reported White's behavior to Gregory Webber, a Maintenance Supervisor for the City of Shelby's Housing Department.

77. Ussery told Webber that White was a pervert and that she never wanted him to have a key or to come into her apartment again.

78. Webber told Ussery that he was glad she'd talked to him, and he would not have White take care of her house.

79. Still, White remained employed by the City of Shelby.

*Briddell Videorecords White*

80. In February 2023, White approached Briddell in her front yard and told Briddell that his wife wasn't "giving [him] none," and that he was "backed up." He told her "I need some. I'll show you a good time; you'll love it." "I just want to lick on that thing."

81. Soon after, in March 2023, Briddell's ex-husband returned to the apartment and resumed living full time with the family.

82. After the ex-husband's return, White seemed to pause some of his sexually harassing behavior toward Briddell.

83. But he would still linger outside of her apartment, watching her unit.

84. So, in early June 2023, Briddell approached White as he sat in his truck up the street from her unit.

85. Briddell recorded a video of their interaction.

86. The conversation focused on White's entry to her apartment, as well as the way White persistently watched her apartment.

87. White also acknowledged that he sexually harassed Briddell, stating: "I know that I came onto you and I tried to fuck you. I tried to fuck you about—at least 10 times I asked for it. I know that."

88. White had sexually harassed Briddell far more than just 10 times.

89. But, with the admission now recorded, Briddell began showing the video to a small number of friends and neighbors.

90. Sometime in October 2023, Housing Department staff member Charles Hogue approached Howell, saying that a resident had seen or heard Briddell's video.

91. The department investigated and concluded that the video was real and that White had made "very inappropriate sexual comments."

92. The department also stated that White later admitted to making the comments.

> **GENERAL INFORMATION**
>
> **Employee Name:** John White     **Department:** Housing
>
> **Job Title:** Resident Services Specialist     **Date:** 11/6/2023
>
> **SUMMARY OF RULE VIOLATION**
> List the specific policy violation and description of the event:
>
> John is being terminated for multiple violations including harassment, immoral or indecent acts, and acts during work which are incompatible with responsible public service as outlined on the Disciplinary Action Grid.
>
> On October 30, 2023, Management was informed about a video recorded by a female resident while talking with John during his work shift. The video is said to contain inappropriate sexual comments including advances toward the female Housing resident. It is taken outside while John is in his work vehicle. After a thorough investigation and conversations with 4 Housing residents, 3 of which have viewed the video, it is evident that the video exists, and very inappropriate sexual comments have been made by John. John admits to these inappropriate comments and is disappointed in himself but wants to be remembered for all of the good he has during his employment with the Housing Department.
>
> (Use additional pages if necessary)
>
> **RECOMMENDED DISCIPLINARY ACTION**
>
> Check appropriate box for current action, and include dates of previous disciplinary warnings:
>
> Step 1: ___ Oral Warning _____ (Date)    Step 3: ___ Suspension _____ (Final Written) (Date)
>
> Step 2: ___ Written Warning _____ (Date)    Step 4: _X_ Termination 11-6-2023 (Date)
>
> Correction Action Plan (if Suspension include dates) (document any EAP referral):

93. Finally, in November 2023, White was terminated from his position with the City of Shelby.

94. A couple months later, after facing eviction, Briddell moved out of her affordable unit on Piedmont Avenue.

95. But while Briddell is living in a new home, she is still suffering the lasting impacts of White's harassment. She experiences chronic anxiety and stress that have given rise to bodily injury. She doesn't feel safe in her own, new home.

10

## Claims for Relief

### Count 1 – Fair Housing Act

### Against the City of Shelby and White

96. Briddell incorporates all other allegations here.

97. White, in his position with the City of Shelby, injured Briddell by committing discriminatory housing practices in violation of the federal Fair Housing Act, including:

   a. Hostile environment sexual harassment in violation of 42 U.S.C. § 3604 and 24 C.F.R. § 100.600(a)(2); and,

   b. Discriminatory statements in violation of 42 U.S.C. § 3604(c).

98. Briddell is therefore entitled to compensatory damages, punitive damages, declaratory relief, attorneys' fees and costs.

99. White is directly liable for the discriminatory housing practices under 24 C.F.R. § 100.7(a)(1).

100. The City of Shelby is vicariously liable for the discriminatory housing practices under 24 C.F.R. § 100.7(b).

101. The City of Shelby is directly liable for the discriminatory housing practices under 24 C.F.R. § 100.7(a)(1)(ii).

### Count 2 – Negligence

### Against the City of Shelby

102. Briddell incorporates all other allegations here.

103. The City of Shelby owed Briddell a duty to hire, train, supervise, and discipline White so as to prevent White from sexually harassing Briddell.

104. Briddell and others put the City of Shelby on notice of White's sexually harassing behavior in plenty of time for the City to take action and prevent some of White's sexual harassment of Briddell.

105. The City of Shelby breached those duties, causing White's harassment of Briddell.

106. The breaches therefore injured Briddell.

107. Briddell is therefore entitled to compensatory and punitive damages.

Count 3 – Trespass

Against the City of Shelby and White

108. Briddell incorporates all other allegations here.

109. Briddell was in possession of the home she rented from the City of Shelby.

110. White repeatedly entered that home without notice, authorization, or legal entitlement.

111. White's trespasses to her home caused Briddell mental suffering, *Matthews v. Forrest*, 235 N.C. 281 (N.C. 1952), or, in the alternative, nominal damages, *id*.

112. The City of Shelby is vicariously liable or White's trespasses because White was on duty and at least pretending to do the work for which the City employed him.

**Prayer for Relief**

113. Briddell prays for a judgment with the following relief:

    a. Compensatory damages,

    b. Nominal damages on the trespass claim,

    c. Punitive damages,

    d. Attorneys' fees and costs,

    e. Pre- and post- judgment interest,

  f. Declaratory relief, and

  g. All other relief that the court finds just.

Dated: May 15, 2024

                Respectfully submitted,

                /s/ G. Christopher Olson
                G. Christopher Olson, NCSB #21223
                OLSON LAW, PLLC
                514 Daniels St., #136
                Raleigh, NC 27605
                t. 919.624.3718
                chris@olsonlaw-pllc.com

                Thomas R. Kayes*
                THE CIVIL RIGHTS GROUP, LLC
                2045 W Grand Ave, Ste B, PMB 62448
                Chicago, IL 60612
                t. 708.722.2241
                tom@civilrightsgroup.com
                www.civilrightsgroup.com

                Attorneys for Plaintiff

                *Pro Hac Vice application forthcoming

**Demand for Jury Trial**

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial on all issues.

Dated: May 15, 2024

                                              Respectfully submitted,

                                              /s/ G. Christopher Olson
                                            G. Christopher Olson, NCSB #21223
                                            OLSON LAW, PLLC
                                            514 Daniels St., #136
                                            Raleigh, NC 27605
                                            t. 919.624.3718
                                            chris@olsonlaw-pllc.com

                                            Thomas R. Kayes*
                                            THE CIVIL RIGHTS GROUP, LLC
                                            2045 W Grand Ave, Ste B, PMB 62448
                                            Chicago, IL 60612
                                            t. 708.722.2241
                                            tom@civilrightsgroup.com
                                            www.civilrightsgroup.com

                                            Attorneys for Plaintiff

                                            *Pro Hac Vice application forthcoming